# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

SAG FL, LLC d/b/a COCOA KIA,

               Plaintiff,

v.                                      Case No.:

KIA AMERICA, INC. f/k/a KIA MOTORS
AMERICA, INC.

               Defendant.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, SAG FL, LLC d/b/a Cocoa Kia ("Plaintiff" or "Cocoa Kia"), sues Defendant Kia America, Inc. f/k/a Kia Motors America, Inc. ("Defendant" or "KMA") and states:

### Parties

1.      Plaintiff, SAG FL, LLC, is a foreign limited liability company with its principal place of business in Delray Beach, FL.

2.      Plaintiff's sole member is John M. Smith, Jr., 555 Old School Road, Gulf Steam, FL.

3.      At all relevant times, Cocoa Kia was a "motor vehicle dealer" as defined in Section 320.60(13)(a), Florida Statutes.

4.      Defendant, KMA, is a California corporation with its principal place of business in Irvine, California. KMA is registered to do business in Florida and is

1

actively doing business throughout Florida, including in this District. KMA is a, "licensee" and/or "manufacturer", and/or "distributor" as defined in Section 320.60(5, 9, 11), Florida Statutes.

5.      At all relevant times, Cocoa Kia and KMA were parties to a Kia Dealer Sales and Service Agreement (the "Dealer Agreement") (attached as "Exhibit A") pursuant to which Cocoa Kia operated a dealership for the sale and service of Kia brand motor vehicles in this District.

6.      The Kia Dealer Agreement is a "franchise agreement" as defined in Section 320.60(1), Florida Statutes.

## Jurisdiction and Venue

7.      This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(1) in that there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00.

8.      This Court has personal jurisdiction over Defendant pursuant to 18 U.S.C. §§ 1965(a) and (d).  Defendant has a registered agent in Florida and regularly conducts and transacts business throughout the State of Florida, including Cocoa, Florida with Plaintiff.  Further, Defendant has obtained a license from the Florida Department of Highway Safety and Motor Vehicles to conduct business in Florida. Thus, Defendant has the requisite minimum contacts with the State of Florida and this Judicial District.  Moreover, in selling new motor vehicles to franchised dealers throughout Florida, Defendant intentionally availed itself of the laws of Florida.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) in that

jurisdiction is founded solely on the basis of diversity, and Defendant, by virtue of its systematic and continuous business contacts in this District, resides in this District.

### Facts Applicable to All Claims

Motor Vehicle Franchise Relationship

10.     As a new motor vehicle dealership, Cocoa Kia is protected from coercion, bad faith and other conduct by motor vehicle distributors pursuant to the Florida Motor Vehicle Dealer Act, s. 320.60 *et seq.* (the "Dealer Act") of the Florida Statutes.

11.     The Dealer Act, s. 320.60 *et seq*, is a remedial statutory scheme enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers/distributors and local dealerships, protecting dealers from, *inter alia,* discriminatory allocation of inventory and other retaliatory and coercive practices by automobile manufacturers/distributors.  The harm that can be caused by abusive manufacturer/distributor practices is exacerbated due to the extremely concentrated market in which new motor vehicle dealers operate.

12.     The Dealer Act gives automobile dealers (e.g., Cocoa Kia) the express right of action to sue an automobile distributor (e.g.,KMA) for, *inter alia*, treble damages, attorneys' fees and costs of the suit for the distributor's violation of the Dealer Act.

13.     In fact, the United States Supreme Court succinctly explained and endorsed the purpose of the Automobile Dealers Day in Court Act ("ADDCA"), which is the Federal equivalent to Florida's Dealer Act, in *New Motor Vehicle Board v.*

*Orrin W. Fox Co.*  Justice Brennan explained that:

> Dealers are with few exceptions **completely dependent on the manufacturer for their supply of cars**.  When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense the **economic captive of his manufacturer**.  The substantial investment of his own personal funds by the dealer in the business, the inability to convert easily the facility to other uses, the dependence upon a single manufacturer for supply of automobiles, and the difficulty in obtaining a franchise from another manufacturer all contribute toward making the dealer an easy prey for domination by the factory.  On the other hand, from the standpoint of the automobile manufacturer, any single dealer is expendable.  The faults of the factory-dealer system are directly attributable to the superior market position of the manufacturer.

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 100 n. 4 (1978) (*quoting* S. Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956)).

14.    Similar to the ADDCA, the Dealer Act's express purpose is to:

> protect the public health, safety, and welfare of the citizens of the state by regulating the licensing of motor vehicle dealers and manufacturers, **maintaining competition**, **providing** consumer protection and **fair trade** and providing minorities with opportunities for full participation as motor vehicle dealers.

§ 320.605, Fla. Stat. (2020).

15.    The Dealer Act necessarily alters the terms of a franchise agreement or dealer agreement between a manufacturer/distributor (e.g., KMA) and its dealers (e.g., Cocoa Kia).  Thus, to create balance in an otherwise inequitable contractual relationship, Florida law overrides various provisions of a franchise agreement and provides Cocoa Kia with additional statutory protections.

16.    Section 320.63(3), Florida Statutes, provides that:

4

In no event may a franchise agreement, or any addendum or supplement thereto, be offered to a motor vehicle dealer in this state until the applicant or licensee files an affidavit with the department acknowledging that the terms or provisions of the agreement, or any related document, are not inconsistent with, prohibited by, or contrary to the provisions contained in ss. 320.60-320.70. Any franchise agreement offered to a motor vehicle dealer in this state shall provide that all terms and conditions in such agreement inconsistent with the law and rules of this state are of no force and effect.

17.    Section 320.64(17), Florida Statutes, provides that a violation occurs if:

The applicant or licensee has included in any franchise agreement with a motor vehicle dealer terms or provisions that are contrary to, prohibited by, or otherwise inconsistent with the provisions contained in ss. 320.60-320.70, or has failed to include in such franchise agreement a provision conforming to the requirements of s. 320.63(3).

18.    Section XVI(K) of the Dealer Agreement also provides that:

[I]f any provision of this Agreement should be held invalid or unenforceable for any reason whatsoever or conflicts with any applicable law, this Agreement will be considered divisible as to such provisions, and such provision will be deemed amended to comply with such law, or if it cannot be so amended without materially affecting the tenor of the Agreement, then it will be deemed deleted from this Agreement in such jurisdiction, and in either case, the remainder of the initial Agreement will be valid and binding.

19.    The Dealer Act is to be liberally construed to protect dealers from manufacturers/distributors.

20.    Pursuant to Section 320.64(18), Florida Statutes, it is a violation of the Dealer Act for a distributor to "establish[] a system of motor vehicle allocation or distribution or [] implement[] a system of allocation or distribution of motor vehicles to one or more of its franchised motor vehicle dealers which reduces or alters allocation

or supplies of new motor vehicles to the dealer to achieve, directly or indirectly, a purpose prohibited by [the Dealer Act] …"

21.     Section 320.64(18) further deems it a violation of the Dealer Act when a distributor's system of allocation or distribution is "unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of the affected motor vehicles dealer or dealers."

22.     Section 320.64(19), Florida Statutes, makes it unlawful for a distributor to fail or delay "to provide a supply of motor vehicles by series in reasonable quantities, including the models publicly advertised by the applicant or licensee as being available".

23.     Pursuant to Section 320.64(22), Florida Statutes, it is a violation of the Dealer Act when a distributor "has refused to deliver, in reasonable quantities and within a reasonable time, to any duly licensed motor vehicle dealer …, any such motor vehicles or parts as are covered by the [franchise] agreement."

24.     The Dealer Agreement requires Defendant to provide its products to Cocoa Kia in "such quantities and types as may be required by DEALER to fulfil its obligations to sell and service Kia products under this Agreement…" *Ex. A* at Section VII.B.

25.     In times of short supply, the Dealer Agreement further requires that vehicles be allocated in a "fair and equitable manner." *Id.*

26.     The Dealer Agreement requires Cocoa Kia to "vigorously and aggressively sell and promote Kia Products" and "vigorously and aggressively

promote, solicit, and make sales of Kia Products within its APR." *Ex. A* at Section II, IX(B)(1).

27.     APR stands for Area of Primary Responsibility, which is a geographic area KMA assigns to each dealer.

28.     Cocoa Kia must "maintain in showroom-ready condition stocks of Kia vehicles and other Kia Products of an assortment and quantity adequate to meet DEALER's share of current demand in DEALER's APR and DEALER's sales and service responsibilities under this Agreement." *Ex. A* at Section II, IX(b)(2).

29.     Importantly, KMA's primary metric for evaluating dealers' satisfaction of sales performance obligations under the Dealer Agreement is Dealer Sales Effectiveness ("DSE").

30.     The Dealer Agreement purports to allow KMA to terminate dealers at any time due to a breach by Cocoa Kia, including failure to meet KMA's sales performance metrics. *Ex. A* at Section XII(C)(3)(xii).

31.     Because KMA contends dealers are obligated to meet their sales performance metrics under the Dealer Agreement, including DSE, KMA can and has attempted to terminate Kia dealers for failure to meet these obligations.

<u>Cocoa Kia's Inventory Issues</u>

32.     Cocoa Kia purchased substantially all of the assets of the prior authorized Kia dealers in the market in October 2017, and John M. Smith, Jr. was named the Dealer Operator.

33.     At the time Cocoa Kia was purchased, KMA requested that the

dealership relocate to a new facility that was up to KMA's facility image standards, and agreed to supply Cocoa Kia with sufficient inventory to justify the relocation and new facility.

34.     Following Cocoa Kia's purchase of the dealership, it vigorously worked to improve the performance of the dealership and undertook a substantial overhaul in operations.

35.     Despite Cocoa Kia's efforts and improvements, KMA placed Cocoa Kia in KMA's Performance Monitoring Program ("PMP") in July of 2019.

36.     A substantial cause of the underperformance was a lack of sufficient inventory from which to retail new Kia vehicles.

37.     However, Cocoa Kia only had limited input in the inventory levels of the store.  As discussed in greater detail *infra*, KMA had greater control over the volume of vehicles delivered for Cocoa Kia's retail sales.

38.     Cocoa Kia did everything it could to improve its dealership operations.

39.     In order to continue improving the dealership's performance, Cocoa Kia invested significant funds to relocate and built a new facility for KMA, and KMA assured Cocoa Kia that it would be provided additional inventory as a result.

40.     The relocated dealership opened on or about November 1, 2019.

41.     The new facility complied with KMA's latest desired image and size guidelines for Kia dealerships.

42.     Despite Cocoa Kia's improvements, relocation, and new state-of-the-art facility, KMA failed or refused to provide it with adequate allocation.

8

43.     Then, around the second half of 2020 the entire industry began facing supply issues shortly after the onset of the COVID-19 pandemic, leading to inventory shortages further exacerbating Cocoa Kia's struggle to obtain a sufficient inventory as compared to competing Kia dealers.

44.     Based on information and belief, KMA and the Kia brand were better positioned than other automotive brands during the pandemic and indeed grew their market share as compared to other brands.  However, Cocoa Kia did not benefit from this growth—instead KMA provided a greater share of Kia inventory to other Kia dealers with Cocoa Kia not getting its fair share.

45.     Cocoa Kia remained intent on growing its business and providing the best representation possible for the Kia brand especially in light of Kia's placement of Cocoa Kia in the PMP program in 2019.  So, in or about October 2020 Cocoa Kia acquired additional adjacent land to further improve its dealership facility by adding 18 additional bays to service customer vehicles and add an additional 91 parking spaces.

46.     But, Cocoa Kia's troubles continued.  As allocation decreased and Cocoa Kia's inventory dwindled further, it made every effort to maximize its inventory using KMA's allocation system.

47.     Throughout the time period that Cocoa Kia operated the dealership, it struggle to obtain an adequate stock of vehicles and repeatedly requested additional inventory from KMA in person, verbally, and in writing.

48.      On or about August 4, 2021, Cocoa Kia sent KMA a letter identifying

9

its lack of inventory and requesting that KMA supply it more vehicles. *See* Ex. B. Some

of Cocoa Kia's observations underpinning its inventory concerns were noted therein.

49.    For example, the August 4ᵗʰ letter noted, *inter alia*:

    (a)  KMA's failure to provide an adequate supply of inventory despite Cocoa Kia's substantial investments in facility and its relocation;

    (b)  Cocoa Kia's efforts to maximize its inventory using KMA's allocation process;

    (c)  Cocoa Kia's improvements, including to its DSE scores;

    (d)  That neighboring Kia dealerships had significantly more vehicles on the ground;

    (e)  That other Kia dealerships were making significant sales into Cocoa Kia's territory as a result of the disparate inventory levels; and

    (f)  That Cocoa Kia had only a fraction on the inventory it had at the same time the prior year.

50.    On or about August 19, 2021, Cocoa Kia sent KMA a letter stating its disagreement with KMA's decision to place Cocoa Kia in the PMP despite Cocoa Kia's improvements and the shortage of available inventory. *See* Ex. C.

51.    On or about August 31, 2021, KMA responded to these letters and refused to agree to the additional supplemental allocation requested in Cocoa Kia's August 4, 2021 letter. Instead, KMA only agreed to provide Cocoa Kia with a mere 15 additional vehicle—less than half the volume of "crucial" inventory requested. *See*

Ex. D at 2.

52.     Unable to correct the purported performance deficiencies without greater cooperation from KMA, Cocoa Kia sold the dealership in or around May 18, 2022, in part due to KMA's failure or refusal to provide it with adequate allocation and the difficulties that created to operate and grow the business.

53.     During the time Cocoa Kia operated the franchise, it lost significant sums of profit it would have otherwise earned by selling new Kia vehicles (if KMA had provided them) and related profit streams.

54.     Further aggravating Cocoa Kia's loss is the impact the lost profits had on the sale price of the dealership.  Since, the goodwill (known in the automotive industry as "blue sky") value of the dealership was derived in large part from the historical profits of the dealership, Cocoa Kia was paid substantially less for the blue sky of the store.

55.     This is not to say the dealership never made a profit—it did.  The issue is that but for KMA's unlawful conduct, the dealership would have been even more profitable especially if the dealership had sufficient inventory to make the sales KMA deemed Cocoa Kia was obligated to make.

56.     It's important to note that the relevant time period here encompasses some of the most profitable times in automotive retail history and times where inventory sold essentially regardless of price.  So, there is no doubt that each additional vehicle KMA should have provided to Cocoa Kia would have sold and done so at a profit to the dealership.

Motor Vehicle Allocation and Distribution From Defendant

57.    Defendant was the sole source of new Kia vehicles and it allocates and distributes those vehicles to authorized dealers periodically.

58.    Based on information and belief, KMA used multiple systems of allocating new Kia vehicles to dealers.

59.    Throughout the relevant time period, Cocoa Kia had less inventory than that of other Kia dealers.

60.    Throughout the relevant time period, Cocoa Kia also lacked sufficient inventory to meet sales obligations set by KMA.

61.    The depletion of Cocoa Kia's inventory made it increasingly difficult for Cocoa Kia to "turn-and-earn" Kia vehicles to receive additional inventory from Defendant.

62.    As a result of KMA's failure to provide it with adequate inventory, Cocoa Kia's sales performance suffered.  Specifically, Cocoa Kia was unable to dig out of the hole it was placed in and achieve the DSE Kia expected Cocoa Kia to achieve.

63.    Based on information and belief, at least one of KMA's systems relied upon the discretion of KMA personnel in deciding which dealers would receive vehicle allocation.

64.    Based on information and belief, it is likely that another of KMA's system of allocation used by KMA relied upon a mathematical formula.

65.    Based on information and belief, KMA had the practice under one or

more of its allocation systems of providing additional new vehicle allocation to Dealer Operators that acquire a Kia dealership, as Cocoa Kia had in 2017.

66. Based on information and belief, KMA had the practice under one or more of its allocation systems of providing additional new vehicle allocation to Kia dealerships that relocate or renovate their facilities as Cocoa Kia had.

67. Based on information and belief, KMA provided additional inventory to dealers that it wanted to assist to advance KMA's business objectives.

68. Indeed, a nearby Kia dealership relocated its dealership (similar to what was done by Cocoa Kia) and that dealer appears to have been provided additional vehicle allocation.

69. Based on information and belief, KMA had the practice under one or more of its allocation systems of providing additional new vehicle allocation to Kia dealerships who were struggling to achieve a satisfactory DSE score as Cocoa Kia had.

70. However, KMA's allocation systems failed to provide Cocoa Kia with additional new Kia vehicles in fair and adequate quantities. Instead, Cocoa Kia was disadvantaged as compared to other Kia dealers in the District, State, Region, and Nation.

71. All else aside, one thing that underscores KMA's pattern of unfair allocation to Cocoa Kia is what they did simultaneous with the sale of the dealership. As the dealership was sold, KMA immediately provided the new dealer with additional inventory, which it had failed to provide to Cocoa Kia when it originally purchased the dealership.

72.     Based upon information and belief, KMA promised the new operator hundreds of additional new Kia vehicles to be delivered within the first months of operation.

## COUNT I
### KMA's Violation of Section 320.64(18), Florida Statutes

73.     The allegations of paragraphs 1 through 72 are re-alleged as if fully set forth herein.

74.     This Count is an action for damages pursuant to Section 320.697, and declaratory relief pursuant to 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, Chapter 86, Florida Statutes (Declaratory Judgments), for KMA's violation of Section 320.64(18), Florida Statutes.

75.     Section 320.64(18), Florida Statutes, provides that a licensee such as KMA has violated the law if it has established a system of distribution of motor vehicles which is "unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of the affected motor vehicles dealer or dealers."

76.     KMA has systems of allocation that violate this statutory obligation.

77.     As set forth above, Defendant's allocation of vehicles to Plaintiff's dealership has been disparate when compared to other dealerships nationally, within Florida, and within the District or Region.

78.     Cocoa Kia's issues regarding disparate inventory began as soon as it acquired the dealership.  More specifically, Cocoa Kia did not receive the same

additional inventory that new operating of Kia dealerships are normally entitled to under KMA's practices.  For example, KMA provided additional allocation to Cocoa Kia's successor dealer once it took over Cocoa Kia, but failed to provide Cocoa Kia the same allocation when it originally purchased the dealership.

79.     From there, inventory issues continued until the dealership was sold.

80.     Throughout its ownership of the dealership, Cocoa Kia was disadvantaged and treated unfairly in regards to new vehicle inventory.

81.     Cocoa Kia repeatedly requested additional inventory from KMA, but did not receive adequate inventory.

82.     KMA repeatedly failed or refused to provide Cocoa Kia with enough inventory to meet DSE, while it provided numerous other dealers with enough inventory to meet their sales performance metrics.

83.     Based on information and belief, KMA provided additional inventory to dealers that it wanted to assist to advance KMA's business objectives.

84.     As a result of KMA's disparate allocation, Cocoa Kia sold less vehicles than it could have it had adequate inventory.

85.     As a result of KMA's disparate allocation and its direct impact on dealership profits, Cocoa Kia was forced to sell its dealership for less than it would have Cocoa Kia received adequate inventory.

86.     KMA's actions violate Section 320.64(18), Florida Statutes in that the allocation and distribution systems are unfair, inequitable, and unreasonably discriminatory to Cocoa Kia and not supported by good reason or good cause.  Cocoa

Kia bases this claim on the vast disparities in the vehicles allocated and distributed by Defendant to the authorized dealers as stated herein.

87.     As a direct result of KMA's actions, Cocoa Kia has suffered lost profits and lost blue sky value when the dealership was sold.

WHEREFORE, Cocoa Kia demands:

(a)     pursuant to Section 320.697, Florida Statutes, entry of a judgment against KMA for treble compensatory damages;

(b)     pursuant to 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, and Chapter 86, Florida Statutes (Declaratory Judgments), a declaration, order, or judgment that KMA has established or implemented systems of motor vehicle distribution that are unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of Cocoa Kia in violation of Section 320.64(18), Florida Statutes;

(c)     an order awarding to Cocoa Kia attorney's fees, prejudgment and post-judgment interest, costs; and such other relief this Court deems just and equitable.

**COUNT II**
**KMA's Violation of Section 320.64(19), Florida Statutes**

88.     The allegations of paragraphs 1 through 72 are re-alleged as if fully set forth herein.

89.     This Count is an action for damages pursuant to Section 320.697, Florida Statutes and declaratory relief pursuant to 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57,

Chapter 86, Florida Statutes (Declaratory Judgments), for KMA's violation of Section 320.64(19), Florida Statutes.

90.     Section 320.64(19), Florida Statutes, prohibits licensees, such as KMA, from "delay[ing], refus[ing], or fail[ing] to provide a supply of motor vehicles by series in reasonable quantities, including the models publicly advertised by the applicant or licensee as being available" to a franchised dealer "without good and fair cause" so long as such failure is not caused by acts outside of the licensee's control.

91.     As set forth above, KMA has failed to supply Cocoa Kia with reasonable quantities of vehicles through its allocation and distribution systems which are solely within its control.

92.     The fact that other dealerships, both locally and nationally, received a substantially greater supply of vehicles demonstrates that KMA's failure to supply vehicles to Plaintiff is without good cause.

93.     For example, KMA provided additional allocation Cocoa Kia's successor dealer once it took over Cocoa Kia, but failed to provide Cocoa Kia the same allocation when it originally purchased the dealership.

94.     KMA also failed or refused to provide Cocoa Kia with enough inventory to meet DSE, while it did provide other dealers with enough inventory to meet their sales performance metrics.

95.     As a result of KMA's disparate allocation, Cocoa Kia determined it was necessary to sell the dealership to mitigate its damages.

96.     Cocoa Kia repeatedly raised concerns with its lack of inventory in

person, verbally, and in writing.

97.    For instance, on or about August 4, 2021, Cocoa Kia sent KMA a letter identifying its lack of inventory and requesting that KMA supply it more vehicles. *See* Ex. B.

98.    Again, on or about August 31, 2021, Cocoa Kia sent KMA another letter stating Cocoa Kia's belief that it could not meet KMA's performance goals without additional inventory. *See* Ex. C.

99.    In response, KMA refused to agree to the additional supplemental allocation requested in Cocoa Kia's August 4, 2021 letter. Instead, KMA only agreed to provide Cocoa Kia with a mere 15 additional vehicles.  *See* Ex. D at 2.  While additional inventory was helpful, that was insufficient to remedy the chronic shortages of inventory suffered by Cocoa Kia.

100.    Afterwards, Cocoa Kia's inventory continued to decline.

101.    Throughout the relevant time period, KMA refused to provide Cocoa Kia with an adequate supply of vehicles.

102.    As a result of KMA's disparate allocation, Cocoa Kia sold less vehicles than it would have if it had adequate inventory.

103.    As a result of KMA's disparate allocation, Cocoa Kia was forced to sell its dealership for less than it could have it had adequate inventory.

104.    KMA's actions violate Section 320.64(19), Florida Statutes in that they have delayed, refused, and failed to provide Cocoa Kia a reasonable supply of Kia vehicles due to actions within its control.  Cocoa Kia bases this claim on the vast

disparities in the vehicles allocated and distributed to other dealers by Defendant while delaying, refusing, and failing to provide an equitable volume of inventory to Cocoa Kia.

105.    As a direct result of KMA's actions, Cocoa Kia has suffered lost profits and competitive standing within the automotive retail community.

WHEREFORE, Cocoa Kia demands:

(a)    pursuant to Section 320.697, Florida Statutes, entry of a judgment against KMA for treble compensatory damages;

(b)    pursuant to 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, and Chapter 86, Florida Statutes (Declaratory Judgments), a declaration, order, or judgment that KMA has failed or refused to supply Cocoa Kia with a supply of motor vehicles by series in reasonable quantities in violation of Section 320.64(19), Florida Statutes;

(c)    an order awarding to Cocoa Kia attorney's fees, prejudgment and post-judgement interest, costs; and such other relief this Court deems just and equitable.

## COUNT III
### KMA's Violation of Section 320.64(22), Florida Statutes

106.    The allegations of paragraphs 1 through 72 are re-alleged as if fully set forth herein.

107.    This Count is an action for damages pursuant to Section 320.697, Florida Statutes and declaratory relief pursuant to 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57,

Chapter 86, Florida Statutes (Declaratory Judgments), for KMA's violation of Section 320.64(22), Florida Statutes.

108.     Section 320.64(22), Florida Statutes, provides that a licensee such as KMA has violated the law if it has "refused to deliver, in reasonable quantities and within a reasonable time, to any duly licensed motor vehicle dealer who has an agreement with such applicant or licensee for the retail sale of new motor vehicles and parts for motor vehicles sold or distributed by the applicant or licensee, any such motor vehicles or parts as are covered by such agreement."

109.     For the relevant time period, Cocoa Kia was an authorized Kia dealer that is party to the franchise agreement with the Defendant.

110.     As set forth above, KMA has failed to supply Plaintiff's dealership with reasonable quantities of vehicles within a reasonable time.

111.     Cocoa Kia repeatedly requested additional inventory from KMA, but did not receive adequate inventory.

112.     Cocoa Kia notified KMA of its lack of vehicle inventory, and requested more inventory, by letter dated August 4, 2021.  *See* Ex. B.

113.     On or about August 31, 2021, Cocoa Kia sent KMA another letter stating Cocoa Kia's belief that it could not meet KMA's performance goals without additional inventory. *See* Ex. C.

114.     KMA responded by letter dated August 31, 2021, but failed to agree to supply sufficient inventory to Cocoa Kia . *See* Ex. D.

115.     It was unreasonable and impractical to expect for Cocoa Kia, a high-

volume dealer, to operate with such meager vehicle inventory.

116.    Throughout the relevant time period, KMA refused to deliver in reasonable quantities and within a reasonable time, vehicles to Cocoa Kia.

117.    As a result of KMA's disparate allocation, Cocoa Kia sold less vehicles than it would have if it had adequate inventory.

118.    As a result of KMA's disparate allocation, Cocoa Kia was forced to sell its dealership for less than it could have it had adequate inventory.

119.    KMA's actions violate Section 320.64(22), Florida Statutes in that it has refused to deliver reasonable quantities of Kia vehicles to Cocoa Kia—an authorized Kia dealership.

120.    As a direct result of KMA's actions, Cocoa Kia has suffered lost profits and competitive standing within the automotive retail community.

WHEREFORE, Cocoa Kia demands:

(a)      pursuant to Section 320.697, Florida Statutes, entry of a judgment against KMA for treble compensatory damages;

(b)      pursuant to 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, and Chapter 86, Florida Statutes (Declaratory Judgments), a declaration, order, or judgment that KMA has refused to deliver, in reasonable quantities and within a reasonable time, vehicles covered by the Kia Dealer Agreement in violation of Section 320.64(22), Florida Statutes;

(c)      an order awarding to Cocoa Kia attorney's fees, interest, costs; and such other relief this Court deems just and equitable.

## COUNT IV
## KMA's Breach of the Dealer Agreement

121.    The allegations of paragraphs 1 through 72 are re-alleged as if fully set forth herein.

122.    Cocoa Kia and KMA are parties to the Kia Dealer Agreement. *See* Ex. A.

123.    The Kia Dealer Agreement requires that KMA provide its products to Plaintiff in a "fair and equitable manner" and "in such quantities and types as may be required by DEALER to fulfil its obligations to sell and service Kia products under this Agreement..." *Ex. A* at Section VII.B.

124.    Defendant failed to provide inventory to Cocoa Kia in a fair and equitable manner.

125.    Defendant has also failed or refused to provide Cocoa Kia with enough inventory to reach its DSE objective, as required by the Dealer Agreement.

126.    Cocoa Kia must "maintain in showroom-ready condition stocks of Kia vehicles and other Kia Products of an assortment and quantity adequate to meet DEALER's share of current demand in DEALER's APR and DEALER's sales and service responsibilities under this Agreement." *Ex. A* at Section II, IX(B)(2).

127.    The Kia Dealer Agreement also requires Cocoa Kia to "vigorously and aggressively sell and promote Kia Products[.]" *Ex. A* at Section II.

128.    Plaintiff has consistently met its obligations under the agreement to the extent made possible by KMA and available inventory.

129.     Despite requests to Defendant seeking additional vehicle inventory, KMA refused to provide Cocoa Kia with a reasonable quantity of vehicles.

130.     At the same time, however, KMA has supplied a substantially greater quantity of vehicles to other Kia dealers, both nationally and locally.

131.     Instead, KMA placed Cocoa Kia in the PMP Program without providing it with the necessary inventory to improve its performance.

132.     KMA had a practice of providing additional inventory to dealers who struggled to achieve their sales performance obligations, but did not provide inventory to Cocoa Kia at the same level.

133.     Similarly, KMA did not provide inventory to Cocoa Kia proportionate to what other dealers who had acquired Kia dealerships or renovated/relocated their facilities.

134.     Defendant materially breached the Kia Dealer Agreement with Cocoa Kia through its failure to supply Cocoa Kia with an adequate supply of vehicles to meet the needs of customers in the area.

135.      As a result of KMA's actions and/or inactions, Cocoa Kia sold less vehicles than it could have if it had adequate inventory and consequently, was damaged by those lost sales.

136.      As a result of KMA's actions and/or inactions, Cocoa Kia was forced to sell its dealership for less than it could have it had adequate inventory.

137.     Cocoa Kia has been monetarily and competitively damaged by this material breach of the Kia Dealer Agreement.

WHEREFORE, Cocoa Kia demands:

(a)        an order awarding to Cocoa Kia attorney's fees, prejudgment and post-judgment interest, costs; and such other relief this Court deems just and equitable.

## COUNT V
### KMA's Breach of the Implied Covenant of Good Faith and Fair Dealing

138.    The allegations of paragraphs 1 through 72 are re-alleged as if fully set forth herein.

139.    Plaintiff and KMA are parties to the Kia Dealer Agreement. *See* Ex. A.

140.    The Kia Dealer Agreement requires that KMA provide its products to Plaintiff in a "fair and equitable manner" and in "such quantities and types as may be required by DEALER to fulfil its obligations to sell and service Kia products under this Agreement..." *Ex. A* at Section VII.B.

141.    Cocoa Kia must "maintain in showroom-ready condition stocks of Kia vehicles and other Kia Products of an assortment and quantity adequate to meet DEALER's share of current demand in DEALER's APR and DEALER's sales and service responsibilities under this Agreement." *Ex. A* at Section II, IX(b)(2).

142.    The Kia Dealer Agreement also requires Cocoa Kia to "vigorously and aggressively sell and promote Kia Products[.]" *Ex. A* at Section II.

143.    Given its standing as an authorized Kia dealership, Cocoa Kia reasonably expects to receive an adequate supply of Kia vehicles for sale at retail. This expectation was reinforced by the assurances made by Kia that it would provide Cocoa Kia with sufficient new vehicles when Cocoa Kia invested in a fully imaged Kia

dealership facility.

144.    At the very least, Cocoa Kia expected to receive enough inventory to meet its sales obligations under the Dealer Agreement.

145.    As DSE is the primary sales performance metric utilized by KMA, Cocoa Kia expected to receive enough allocation to meet its DSE goals.

146.    KMA had a practice of providing additional inventory to dealers who struggled to achieve their sales performance obligations, but did not provide inventory to Cocoa Kia at the same level.

147.    Similarly, KMA did not provide inventory to Cocoa Kia proportionate to what other dealers who had acquired Kia dealerships or renovated/relocated their facilities.

148.    Under Florida law, every contract contains an implied covenant of good faith and fair dealing that requires parties to conform to the standards of good faith and fair dealing in order to protect reasonable contractual and commercial expectations.

149.    Defendant's actions and inactions in connection with its refusal to supply an adequate number of vehicles to Cocoa Kia constitutes a breach of the implied covenant of good faith and fair dealing in the Kia Dealer Agreement in that Cocoa Kia's expectations have not been met.

150.    As a result of KMA's actions and/or inactions, Cocoa Kia sold less vehicles than it could have it had adequate inventory

151.    As a result of KMA's actions and/or inactions, Cocoa Kia was forced

to sell its dealership for less than it could have if it had been provided with adequate inventory.

152.    Cocoa Kia has been monetarily and competitively injured by this intentional breach of the implied covenant of good faith and fair dealing in the Kia Dealer Agreement.

WHEREFORE, Cocoa Kia demands:

(a)    an order awarding to Cocoa Kia attorney's fees, prejudgment and post-judgment interest, costs; and such other relief this Court deems just and equitable.

### Jury Trial Demand

Plaintiff hereby demands trial by jury of all matters so triable.

Respectfully submitted this 31st day of October, 2023.

Respectfully Submitted,

*/s/ Nicholas A. Bader*
Nicholas A. Bader (FBN 55351)
Jason T. Allen (FBN 25659)
Andrew G. Thomas (FBN 1018226)
**BASS SOX MERCER**
2822 Remington Green Circle
Tallahassee, Florida 32308
T: 850.878.6404

nbader@bsm-law.com
jallen@bsm-law.com
athomas@bsm-law.com

*Attorneys for Plaintiff*